IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.   11-cv-2434-WYD-MEH

CARL GENBERG,

    Plaintiff,

v.

STEVEN S. PORTER,

    Defendant.

---

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

**I.     INTRODUCTION**

THIS MATTER is before the Court on Defendant Steven S. Porter's Motion for Summary Judgment (ECF No. 235), filed on January 18, 2016.   The matter arises out of events surrounding Plaintiff Carl Genberg's ("Genberg") separation from his employer, Ceragenix Pharmaceuticals ("Ceragenix").  Defendant Steven S. Porter ("Porter") served as the Chief Executive Officer of Ceragenix, and as a member of its Board of Directors.  Porter claims that Genberg, who served as the company's Vice President of Research and Development, was fired pursuant to a unanimous vote of the Board of Directors of Ceragenix for breaching his fiduciary duty of loyalty in providing material non-public information to outsiders.

On December 29, 2014, Plaintiff Carl Genberg ("Genberg") filed his Third Amended Complaint ("TAC") in this matter against Porter.  Genberg claims that he engaged in protected activity under the Sarbanes-Oxley Act ("SOX") (18 USC § 1514A), and that his termination was in retaliation for that activity.  Genberg also claims that

1

Porter issued defamatory statements about Genberg in publications about Genberg's termination, and that Nevada law, not Colorado law, governs his claim of defamation.

## II. BACKGROUND

Genberg worked for Ceragenix Pharmaceuticals, Inc. and Ceragenix Corporation ("Ceragenix") from January 1, 2005, to March 28, 2010, as the Senior Vice President for Research and Development. Ceragenix Pharmaceuticals, a Delaware corporation, became a public company in April 2005 through a reverse merger with Onsource Corporation ("Onsource"). In the reverse merger, Onsource acquired Osmotics Pharma, Inc., a subsidiary of Osmotics Corporation, and Onsource transferred 92% of its shares to Osmotics Corporation. The end result of the reverse merger was that Osmotics Pharma, Inc., became Ceragenix Corporation, and Onsource became Ceragenix Pharmaceuticals.

Subsequent to the reverse merger, Osmotics Corporation created a Plan of Distribution, under which Osmotics Corporation placed over twelve million Ceragenix Pharmaceuticals shares in a custodial account awaiting final distribution to Osmotic Corporation's shareholders that chose to exchange their shares for shares in Ceragenix Pharmaceuticals. Osmotics Corporation granted Ceragenix Pharmaceuticals's Board of Directors ("BOD") the irrevocable power to vote the shares of Ceragenix Pharmaceuticals held in the custodial account. Thus, even though Osmotics Corporation owned the over twelve million Ceragenix Pharmaceutical shares in the custodial account, Osmotics Corporation's shareholders turned over the voting power with respect to those shares. Osmotics Corporation anticipated that the shares in the custodial account would be distributed and exchanged within one year. However, after

five years, the shares had not been distributed, and as of 2010, the Plan of Distribution had not been completed.

Genberg approached his friend and one of the largest owners of Osmotics Corporation shares, Joseph Salamon ("Salamon"), and proposed that Salamon create his own plan for exchanging his Osmotics Corporation shares for Ceragenix Pharmaceuticals shares, and present the plan to Osmotics Corporation's BOD. Salamon created a plan and authorized Genberg to present the plan to Porter. Porter rejected the plan, and accused Genberg of providing material non-public information to Salamon to induce him to make the offer. The BOD discussed concerns about Genberg's communications with outside parties in February 2010, and scheduled a BOD meeting for March 3, 2010. ECF No. 235, p. 6.

Genberg spoke to Salamon again, and suggested that Salamon write a letter to Ceragenix's BOD regarding concerns about voting the shares and the BOD's failure to hold annual shareholder meetings in violation of Delaware law. Genberg drafted an email that Salamon signed and sent to the BOD on March 2, 2010 (the "Salamon email"). *See* ECF No. 235-14. Suspecting that Genberg was the true author of the email, the BOD sent a letter to Genberg on March 3, 2010, instructing him to cease and desist from any further communications with outsiders on these issues. *See* ECF No. 235-16. The following day, Genberg sent a letter to Cheryl Hoffman-Bray, a member of the Ceragenix's BOD and head of the Audit Committee, alleging that Porter had engaged in insider trading and committed several other federal securities violations (the "Hoffman-Bray letter"). *See* ECF No. 235-17, p. 3-6.

In response to the concerns raised by the Hoffman-Bray letter, Ceragenix launched an investigation into the insider trading allegations, as well as the authorship of the Salamon email, by way of an independent investigator, attorney Marc Redlich ("Redlich"). Redlich interviewed Genberg and confirmed that Genberg authored the Salamon email. On March 17, 2010, Redlich disclosed the results of his investigation to Ceragenix's BOD. Redlich concluded that Genberg had willfully violated his fiduciary duty of loyalty to the company and that termination might be appropriate.

On March 26, 2010, Ceragenix's BOD held a special teleconference meeting to discuss the Salamon email and the results of Redlich's report. The BOD agreed to terminate Genberg for cause in accordance with his employment agreement, which stated that a breach of fiduciary duty could result in termination for cause. ECF No. 89-2, p. 21, ¶ 15(a)(4). On March 26, 2010, Porter notified Genberg via letter that his employment was being terminated for cause, effective March 29, 2010, for breach of fiduciary duty of loyalty for drafting the Salamon email. Porter then sent email communications regarding Genberg's termination to Ceragenix's investor relations consultant and three members of the secured lenders for Ceragenix. He also filed a Form 8-K with the SEC, which is a required report for certain material corporate events, disclosing that Genberg had been terminated as an officer of the company.

On July 11, 2011, Genberg filed this action in the United States District Court for the District of Nevada. Porter filed a Motion to Transfer Venue and on September 6, 2011, this matter was transferred to the United States District Court for the District of Colorado.

### III.  STANDARD OF REVIEW

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Emp't Opportunity Comm'n v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A material fact is one that might affect the outcome of the dispute under the applicable law.  *Ulissey v. Shvartsman,* 61 F.3d 805, 808 (10th Cir. 1995).  The Court must construe all inferences in favor of the party against whom the motion under consideration is made.  *Pirkheim v. First Unum Life Ins. Co.,* 229 F.3d 1008, 1010 (10th Cir. 2000).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

### IV.  DISCUSSION

In his third amended complaint, Plaintiff asserts two causes of action: 1) Sarbanes-Oxley Act Retaliation Violation, pursuant to 18 U.S.C. § 1514A; and 2) Defamation.  *See* TAC, ECF No. 175.

*A. Sarbanes-Oxley Act Retaliation Violation*

SOX prohibits publicly traded companies from discharging an employee because of any lawful act done by the employee:

> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information . . . is provided to
>
> . . .
>
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

18 U.S.C. § 1514A(a)(1)(C). A plaintiff bears the burden of establishing a prima facie case under § 1514A and must prove by a preponderance of the evidence that: 1) he engaged in protected activity; 2) the employer knew that he engaged in the protected activity; 3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Lockheed Martin Corp. v. Administrative Review Board*, 717 F.3d 1121, 1129 (10th Cir. 2013). To demonstrate that a plaintiff engaged in a protected activity, he must show that he had both a subjective belief and an objectively reasonable belief that the conduct he complained of constituted a violation of relevant law. *Id.* at 1132.

It is undisputed that Genberg suffered an unfavorable personnel action – termination of employment – and that Porter stated that he was being terminated for his role in drafting the Salamon email. Thus, the relevant question is whether Genberg engaged in protected activity under § 1514A when he drafted the Salamon email.

In order for activities to be considered protected under § 1514A, they must be covered by one of the six laws enumerated in the statute. Such protected activity must relate to the substantive law protected by SOX "definitively and specifically." *Fraser v. Fiduciary Trust Co. Int'l*, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009) (citations

omitted). General inquiries do not constitute protected activity. The Salamon email, in pertinent part, contained the following statements:

> We are writing to you to request the immediate transfer of voting rights in the proxy you hold over shares of Ceragenix. . . . This request is based, in part, on recent SEC changes to proxy voting rules (affecting the ability of shares held in "street name" to be voted by brokers in uncontested elections for the Board of Directors) and the stated rationale of the SEC Chairman Shapiro: "The amendment was designed to help assure that voting rights for director elections are exercised by those with an economic interest in the company, rather than by broker, thereby improving corporate governance and enhancing accountability." While the new proxy rule is not directly applicable (as it applies to share[s] held in street name voted by brokers), the policy rationale is clearly on point. We believe that [it] is neither fair, just [n]or equitable that you retain the voting power over these shares for 5 years and use such power to re-elect the members of the Board of Directors without any consideration for the interests of investors. We therefore request that the proxy should be assigned to us as the beneficial parties in interest of these shares.

ECF No. 235-14, p. 2

The Salamon email also noted that the BOD had failed to hold annual shareholder meetings, which it alleged was in violation of Title 8 Section 211(C) of the Delaware General Corporate Laws. The email concludes as follows:

> We hope that you share SEC Chairman Shapiro's view that voting rights should be exercised by those with an economic interest in the company. We ask that you immediately transfer to us the proxy granted to you over the common shares of Ceragenix so that we may exercise this voting power until such time that Osmotics completes its long delayed plan of distribution for these shares.

*Id.* at 4.

The only enumerated law referenced in the Salamon email is "any rule or regulation of the Securities and Exchange Commission." However, the author of the email admits that the rule "is not directly applicable" in this matter. Instead, the email

7

urges the BOD to consider the *rationale* of the rule, and relies on the argument that it is "neither fair, just [n]or equitable" that the BOD retain voting power over the shares in question.

It is clear that Genberg and Salamon were unhappy with the fact that the distribution plan had not been completed in the time frame anticipated by all of the parties when the plan was conceived. However, the fact remains that in 2005, the shareholders – including Salamon – knew that twelve million shares were being placed into an escrow account, and they agreed to grant the BOD the irrevocable power over those shares until the plan of distribution was completed. Genberg, far from being an unsophisticated employee who might require the protections of a broad SOX provision in order to blow the whistle on internal misconduct, admits to being a "former trial attorney specializing in securities and business litigation." ECF No. 236, p. 2. His knowledge of SOX and related matters, along with the nonspecific allegations of his email, lead the Court to conclude that he did not have a reasonable belief that any specific SEC rule or regulation was being violated. Further, none of the other enumerated laws is referenced in the email. Although the email suggests that the BOD was in violation of rules pertaining to shareholder meetings, the email cites Delaware law, not federal law. Because none of the six enumerated laws of § 1514A is referenced in the Salamon email, it does not qualify as protected activity, and Genberg cannot establish a prima facie case under SOX.

Porter concedes that Genberg's Hoffman-Bray letter constitutes protected activity under SOX. Whether the Hoffman-Bray letter was a contributing factor to Genberg's termination is disputed. Considering the dispute in a light most favorable to Genberg,

the Court presumes that Genberg can establish a prima facie case of a SOX violation for writing the Hoffman-Bray letter. The burden, therefore, shifts to Porter to demonstrate by clear and convincing evidence that the BOD would have taken the same adverse employment action even in the absence of the protected activity. *See Wiest v. Tyco Elecs. Co.*, 812 F.3d 319, 329 (3d Cir. 2016). Genberg argues that the temporal proximity between his insider trading allegations against Porter and his termination suggest that his protected activity contributed to his termination.

However, temporal proximity alone is insufficient to show causation where there exists an intervening event that would have led to the adverse action. *Mizusawa v. U.S. Dep't of Labor*, 524 Fed. Appx 443, 448 (10th Cir. 2013); *Wiest*, 812 F.3d at 319 (a causal connection may be severed by some legitimate intervening event); *Yang v. Navigators Grp. Inc.*, 2016 WL 67790, at *6 (S.D.N.Y. Jan. 4, 2016) ("Temporal proximity does not, however, 'compel a finding of causation, particularly when there is a legitimate intervening basis for the adverse action.'"); *Barber v. Planet Airways, Inc.*, 2006 WL 1151953, at *5 (ARB Apr. 28, 2006) ("inferring a causal relationship between the protected activity and the adverse action is not logical when the two are separated by an intervening event that independently could have caused the adverse action.").

Here, Porter argues that the intervening events include the confirmation that Genberg authored the Salamon email and the findings of Redlich's report.[1]

Redlich's report included the following statements:

The most surprising revelation to me was Carl Genberg's admission in our meeting that he had drafted the demand letter sent by Joseph Salamon

---

[1] Genberg argues in his Response that the Redlich report cannot be considered at the summary judgment stage because it is hearsay under F.R.E. 801(c). However, it is clear that the report is not being offered for the truth of the matter asserted, but instead for the effect that it had on the BOD's state of mind. *See Fester v. Farmer Bros. Co.*, 49 Fed. Appx 785, 789 (10th Cir. 2002).

9

> . . . . I see this as an improper action (and no doubt the culmination of other improper actions), in violation of Genberg's duty of loyalty to the Company.  It is the Board of Directors, comprised of the elected representatives of the shareholders, that sets overall company policy and direction; and it is the duty of the officers to execute and accomplish those policies.  By aiding and abetting a take-over attempt and drafting a letter for an outside organization confronting the Board, Genberg has in my opinion, crossed the line and breached his fiduciary duty of loyalty to his Company.  Whatever his reasons or beliefs, those should have been properly expressed to the Board confidentially, not in a broadside on behalf of an outside group, or groups, seeking to seize control of the Company and to oust its Board . . . . [T]he revelation about Genberg's role in the Salamon demand letter may prompt the Board to take a new look at whether Genberg's minuses outweigh the pluses going forward.

ECF No. 235-37, p. 10-12.

The record indicates that the BOD was concerned about Genberg's communications with outside entities in February of 2010.  *See* ECF No. 235, p. 6. After the investigation by Redlich and the findings of his report, combined with the BOD's previous concerns about Genberg's loyalty and the confirmation of Genberg's role in drafting the Salamon email, the BOD made the decision to terminate Genberg's employment.  Genberg was fired because the BOD believed he had colluded with outsiders.  *See id.* at 17.  Because there was a legitimate intervening basis for Genberg's termination, any argument that he was terminated because of his protected activity of writing the Hoffman-Bray letter is undermined.  Further, it is not the role of the Court to "act as a 'super-personnel department' second guessing employers' honestly held (even if erroneous) business judgments."  *Young v. Dillon Co.*, 468 F.3d 1243, 1250 (10th Cir. 2006), citing *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004); *see also Rivera v. City and Cnty of Denver*, 365 F.3d 912 (10th Cir. 2004) ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair or

10

correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."); *Wiest*, 812 F.3d at 319 (it is not the court's role to "second-guess a human resources decision that followed a thorough investigation."); *Feldman v. Law Enforcement Assoc. Corp.*, 752 F.3d 339 (4th Cir. 2014) (applying the same logic to SOX claims).

Accordingly, because Genberg has failed to establish a prima facie case of an SOX violation for drafting the Salamon email, and Porter has demonstrated a legitimate intervening event to justify Genberg's termination despite any protected activity under SOX, Porter is entitled to summary judgment on Genberg's claim of SOX retaliation.

  *B. Defamation*

On March 28, 2010, Porter sent an email to Jim Painter, Ceragenix's investor relations consultant in order to notify him of Genberg's termination and to prepare him for possible investor inquiries (the "Painter email"). In that email, Porter referred to Genberg's actions as part of a "hostile takeover assault" and that Genberg had acted as "the Judas in house facilitating [the] takeover." ECF No. 235, p. 12. On March 29, 2010, Ceragenix released a Form 8-K (an SEC report of certain material corporate events), which stated that Genberg had been terminated for cause, and that his termination was the result of an investigation (the "Form 8-K"). ECF No. 235-39. Finally, on March 29, 2010, Porter sent an email to the three managing members of the secured lenders for Ceragenix (the "lenders email") to notify them of Genberg's termination, noting that he had been terminated for "willful breach of fiduciary loyalty." ECF No. 235, p. 13.

Genberg argues that statements in all three publications constitute defamation *per se* and that the statements were made with actual malice. TAC, ¶¶ 81, 152-53. He argues that the phrase "terminated for cause" in the Form 8-K is an unprivileged statement that Genberg was unfit for office. *Id.* at ¶ 147. He further argues that Porter's use of the term "Judas" in the Painter email was meant to "vilify and defame" Genberg, and was anti-Semitic in nature. *Id.* at ¶ 149; Response, ECF No. 236, p. 50 n.4, 54. He argues that he has suffered damage to his reputation as a result of the statements. *Id.* at ¶ 154. Genberg also argues that Nevada law, not Colorado law, governs his defamation claim. Porter takes no position on the choice of law issue, but argues that regardless of which state's law governs, Genberg's claim has no merit.

A federal district court exercising diversity jurisdiction under 28 U.S.C. § 1332 must apply the choice of law rules of the forum state. *Iskowitz v. Cessna Aircraft Co.*, 2009 WL 3162016, at *2 (D. Colo. Sept. 30, 2009); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Colorado's choice of law standard is the "most significant relationship to the occurrence and parties test" as expressed in the Restatement (Second) Conflict of Laws, §145. *AE, Inc. v. Goodyear Tire and Rubber Co.*, 168 P.3d 507 (Colo. 2007). Section 145 of the Restatement provides more specific guidance concerning tort claims. First, the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which has the most significant relationship to the occurrence and the parties. Second, contacts to be taken into account include the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation

12

and place of business of the parties; and the place where the relationship, if any, between the parties is centered.

Genberg is a citizen of the State of Nevada, domiciled in the city of Las Vegas. At all times material to this matter, he worked from a home office in Las Vegas, Nevada. TAC, ¶ 82. Genberg argues that the three communications from Porter to various parties constitute multistate publications, but that his reputation was injured in Nevada. Porter does not dispute this. Accordingly, the Court will analyze Genberg's defamation claim under Nevada law.

The Supreme Court of Nevada has held that a defamation claim requires demonstrating 1) a false and defamatory statement of fact by the defendant concerning the plaintiff; 2) an unprivileged publication to a third person; 3) fault, amounting to at least negligence; and 4) actual or presumed damages. *Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005); *Simpson v. Mars, Inc.,* 929 P.2d 966, 967 (Nev. 1997). As to damages, if the defamatory communication concerns a person's lack of fitness for trade, business, or profession, or tends to injure the plaintiff in his or her business, it is considered defamation *per se* and damages are presumed. *Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503 (Nev. 2009).

The first question, then, is whether the statements in question were false and defamatory. "There can be no liability for defamation without proof of falsity," and the plaintiff bears the burden of proof regarding the statement's falsity. *Gordon v. Dalrymple*, 2008 WL 2782914, at *3 (D. Nev. July 8, 2008), citing *Nevada Ind. Broad. Corp. v. Allen,* 664 P.2d 337, 412 (Nev. 1983); *see also Flowers v. Carville,* 112 F. Supp. 2d 1202, 1210 (D. Nev. 2000) (a statement may only be defamatory if it contains

13

a factual assertion that can be proven false). It is a question of law, within the province of the court, to determine whether a statement is capable of defamatory construction. *Branda v. Sanford*, 637 P.2d 1223, 1225-26 (Nev. 1981). A statement is defamatory when "[u]nder any reasonable definition such charges would tend to lower the subject in the estimation of the community and to excite derogatory opinions against him and to hold him up to contempt." *Las Vegas Sun v. Franklin*, 329 P.2d 867, 869 (Nev. 1958). The statements that Genberg was terminated for cause after an investigation, and had breached his duty of loyalty to the company could be construed as relating to his integrity and ability to perform his job, and thus, could be construed as defamatory because they impute dishonest and possibly unlawful conduct on the part of Genberg. If a statement is susceptible to different constructions, one of which is defamatory, it becomes a question of fact for the jury. *Id; see also Fink v. Oshins*, 49 P.3d 640, 646 (2002) (whether a statement is true or false is an issue of fact for the jury); *Nevada Ind. Broadcasting v. Allen*, 664 P.2d 337, 343 (Nev. 1983) (the truth or falsity of an allegedly defamatory statement is an issue of fact properly left to the jury for resolution).

Regardless of the Court's determination of whether the statements meet the first element of defamation, Porter argues that he is entitled to summary judgment under the affirmative defense of the common interest privilege. Nevada's common interest privilege protects the publication of a defamatory statement if the defendant made the statement "in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or a duty, if it is made to a person with a corresponding interest or duty." *Williams v. Univ. Med. Ctr. of S. Nevada*, 688 F. Supp. 2d 1134, 1146-48 (D. Nev. 2010), citing *Lubin v. Kunin,* 17 P.3d 422, 428 (2001).

Whether the common interest privilege applies is a question of law for the court. *Circus Circus Hotels, Inc. v. Witherspoon,* 657 P.2d 101, 105 (Nev. 1983). If the court determines that the privilege applies, the plaintiff then bears the burden of proving the defendant published the communication with actual malice. *Id.*

Here, Porter disclosed Genberg's termination to the company's investor relations consultant and three managing members of the secured lenders for Ceragenix. He also disclosed the termination through the filing of the Form 8-K with the SEC. Porter argues that the recipients of the Painter email and the lender email "needed to be informed of Genberg's discharge" because the lenders "had a large financial stake in Ceragenix" and "Painter would be fielding shareholder questions about the [Form 8-K]." Reply, ECF No. 237, p. 18. Neither Painter nor the lenders was an employee of Ceragenix, nor members of the BOD, but they did have a corresponding interest in the implications of Genberg's discharge, and Painter had a duty to respond to any investor inquiries regarding Genberg's departure from Ceragenix. Likewise, Porter had a duty to file a Form 8-K with the SEC, under the requirements as described in Item 5.02(b) of the Form. Accordingly, the common interest privilege applies to Porter's good faith communications to Painter, the lenders, and to his disclosure in the Form 8-K.

The burden shifts, therefore, to Genberg to prove that Porter acted with actual malice in publishing the statements. Actual malice means the defendant knew the statement was false, or exhibited a reckless disregard for the statement's truth. *Williams*, 688 F. Supp. 2d at 1147. Reckless disregard for the truth means a high degree of awareness of the statement's probable falsity. *Id.* A plaintiff meets this stringent burden by presenting "sufficient evidence to conclude that the defendant in

15

fact entertained serious doubts as to the truth of the publication." *Id.* (citation omitted). The inquiry thus concerns "the defendant's belief regarding truthfulness of the published material rather than on the defendant's attitude toward the plaintiff." *Id.* (citation omitted). Genberg, citing Colorado law, argues that the issue of actual malice is one for the jury to decide. *Id.* However, under Nevada law, the question of actual malice goes to the jury *only* if there is sufficient evidence for the jury to reasonably infer that the publication was made with actual malice. *See Circus Circus*, 657 P.2d at 105.

As to the Painter and lender emails, Genberg offers no argument or case law against the idea that Painter and the lenders were legitimate recipients of communications under the common interest privilege. He offers only an argument that the Painter email meets the standard for actual malice because Porter used the word "Judas" with anti-Semitic and malicious intent. ECF No. 236, p. 54. The Painter email refers to Genberg's actions as part of a "hostile takeover assault" and notes that Genberg had acted as "the Judas in house facilitating [the] takeover." ECF No. 235, p. 12. Genberg argues that Porter has "an ugly attraction to racially bigoted humor" against different racial groups, and a "fondness for 'Jew jokes.'" ECF No. 236, p. 54. He argues that "the sins attributed to Judas – avarice and betrayal – have been used by anti-Semites throughout the centuries to attack Jews as they view Judas as the archetypal Jew including Nazi propaganda." *Id.* at 25.

These arguments for actual malice, however, fail to meet the standard. Genberg must demonstrate that Porter knew the statements were false, that he exhibited a reckless disregard for the truth of the statement, or that he entertained serious doubts as to the truth of the statement. The inquiry concerns Porter's belief regarding

truthfulness of the published material, not his attitude toward Genberg.  Porter argues that he used the word "Judas" to convey the idea that Genberg had betrayed the trust of the company.  Genberg offers no evidence to support the argument that Porter entertained serious doubts about the truth of that statement.  In fact, the record indicates that Porter believed that Genberg had breached his duty of loyalty to the company.  The fact that Porter used an arguably offensive word in his statement does not mean that the standard is met to show actual malice, and Genberg offers no case law to support the argument that it does.

As to the Form 8-K, Genberg argues that Porter published more than what is required, and that this demonstrates actual malice.  He notes that Item 5.02(b) requires only a disclosure that the termination occurred and the date that it occurred.  However, the addition of language that Genberg was terminated for cause after an investigation does not satisfy the standard for actual malice.  Genberg must demonstrate that Porter knew the statements were false, or that he exhibited a reckless disregard for the truth of the statements.  In fact, the record demonstrates that Porter believed the statements were true – that Genberg was fired for cause after an investigation.  Accordingly, Genberg has not met his burden to demonstrate actual malice.

**V.     CONCLUSION**

For the reasons set forth herein, it is hereby

ORDERED that Defendant Steven S. Porter's Motion for Summary Judgment (ECF No. 235) is **GRANTED**, and Plaintiff's claims of Sarbanes-Oxley Act Retaliation and Defamation are dismissed with prejudice.  Each party shall bear their own costs and attorneys' fees.

Dated: August 11, 2016

BY THE COURT:

<u>s/ Wiley Y. Daniel</u>
Wiley Y. Daniel
Senior United States District Judge